WILLIAM V. ELLIOTT, Public Administrator of Kings County, as Administrator of the Estate of THOMAS QUINN, Deceased, Appellant, *v.* NEW YORK RAPID TRANSIT CORPORATION, Respondent.

Argued May 17, 1944; decided June 14, 1944.

*Edward Friedman* for appellant. I. The proof established plaintiff's cause of action both as to operational negligence of defendant as a common carrier and under the doctrine of last clear chance. (*Fardette* v. *New York & Stamford R. Co.,* 190 App. Div. 545; *Fagan* v. *Atlantic Coast Line R. R. Co.,* 220 N. Y. 301.) II. Under the last-clear-chance doctrine the defendant's negligence proximately caused the death of the deceased. (*Rider* v. *Syracuse R. T. Ry. Co.,* 171 N. Y. 139; *Storr* v. *New York Central R. R. Co.,* 261 N. Y. 347.) III. The defendant owed the deceased a special duty to protect him from injury, because of his known intoxicated condition. A jury could reasonably infer that his death was caused by failure to perform this duty. (*Fagan* v. *Atlantic Cost Line R. R. Co.,* 220 N. Y. 301; *O'Hanlon* v. *Murray,* 285 N. Y. 321; *People* v. *Harris,* 136 N. Y. 423; *Dillon* v. *Rockaway Beach Hospital,* 284 N. Y. 176.)

*Ignatius M. Wilkinson, Corporation Counsel* (*Joseph F. Mulqueen, Jr.,* and *James Hall Prothero* of counsel), for respondent. Plaintiff failed to make out a case under the doctrine of the last clear chance. Since the conductor stated that the train was moving when plaintiff's intestate jumped on and that he immediately employed every means to stop the train — both statements being uncontradicted — there was no issue to place

before a jury and the complaint was properly dismissed. (*Woloszynowski* v. *N. Y. C. R. R. Co.*, 254 N. Y. 206; *Panarese* v. *Union Railway Co.*, 261 N. Y. 233; *Storr* v. *New York Central R. R. Co.*, 261 N. Y. 348; *Hernandez* v. *Brooklyn & Queens Transit Corp.*, 284 N. Y. 535; *Dauphinee* v. *New York Rapid Transit Corp.*, 290 N. Y. 683; *Albrecht* v. *Rochester, S. & E. R. R. Co.*, 205 N. Y. 230.)

CONWAY, J. The deceased met his death at about 7:00 o'clock in the evening on a night in July by falling from a south-bound elevated railroad train at a point beyond the Third Street station on the Fifth Avenue-Culver line in Brooklyn. At the time of his death he was forty-seven years of age and was employed in the repair shop of the Interborough Rapid Transit Company. He had been employed there for five years and prior to that had been employed by a public utility company. When his body was taken to the morgue it was found by the toxicologist to the Chief Medical Examiner of New York City, upon autopsy, that his skull had been fractured and that there had been at the time of death 52% of alcohol in his liver, a condition which causes one so found to be designated as a four-plus alcoholic case. The toxicologist testified that the majority of four-plus cases are so intoxicated as to render them hardly capable of walking. One such has almost complete loss of equilibrium. When one has 52% of alcohol in the liver there is about the same quantity in the brain. That quantity of alcohol in the brain depresses all the brain centers and causes a general anesthetization. Such a quantity causes some to lie in coma. The doctor further said that a smaller quantity of alcohol will produce a four-plus alcoholic state in a light drinker more quickly than in a heavy drinker because the heavy drinker, through habit, is able to oxidize or burn up the alcohol more rapidly.

We have purposefully called attention to the station at which the deceased met his death (which was one station beyond the station nearest to his home on Carroll Street, where he lived in the home of the sexton of a church), the time of the occurrence (which was a time when the deceased might well have been returning home from his work in the repair shop) and his helpless condition (which would indicate the degree of duty

which the defendant imposed upon itself when it elected to carry the deceased).

The deceased boarded the elevated railroad train at what was known as the Adams Street station. The running time between the Adams Street station and the Third Street station was fourteen minutes. To reach the Adams Street station one had to climb the stairs and pay his fare in the station office. At that station the conductor of the train on which the deceased rode, whose business it was to take care of the two end platforms of the first and second cars of the train, saw the deceased staggering to the train. The gates operated by that conductor, Dingle, were four and one-half feet high and were of the type which were manually operated and swung inward so that when fully opened they rested at right angles to the position in which they had been when closed. Deceased was the last to enter the second car. He staggered into it and sat down. In the fourteen minute run, Dingle observed him three times for about a minute each time. When the Third Street station was reached the train was stopped in such position that the rear end of the first car was eighteen feet north of the nearest wall of the station office. In that wall were two doors which admitted one to the office or waiting room and thus to the stairs which led down to the street. The length of the car was forty-eight feet and thus the car extended beyond the wall of the station office, to which reference has been made, for thirty feet. There was a cat-walk below the rails and the station office which extended some distance southerly beyond the office.

When the train stopped, the conductor, Dingle, waited for the deceased to stagger out of the car and held the gate of the second car open for him to leave. The deceased stopped to express his appreciation, assured Dingle that he was a gentleman and attempted to shake hands with him. This Dingle was reluctant to do. He told deceased to step away from the train. Dingle shut the gate and gave the signal to the motorman to go ahead. The train had barely moved — Dingle estimated that it had moved one foot — when the deceased took hold, at a height of about six feet, three inches, of two uprights, referred to as stanchions, which extended from the platform to the roofs of the first and second cars respectively. He was

carried, with his feet " dangling " (Dingle's expressive word) the eighteen feet to the wall of the station office, the thirty feet from there to the south end of the station and another five feet further to the south, a total of fifty-three feet, before he lost his hold upon the uprights, fell to the cat-walk and thence to the street. The train proceeded eighty feet from the time it began to move until it was brought to an emergency stop by Dingle. It moved, therefore, approximately seventy-nine feet after the deceased took hold of the uprights. On the rear platform of the first car and on the forward platform of the second car there were pull-cords attached to the emergency brake. Dingle had but to reach for either one after taking one step. The motorman testified that it could be pulled " immediately ". It was Dingle's testimony and that of the motorman that a pull upon the emergency brake cord would bring the train to a stop in from twenty to twenty-five feet. The emergency brake was operated without any relation to the motorman. In other words, a pull upon the brake cord took control of the train from the motorman.

On that testimony a *prima facie* case was established which entitled the plaintiff administrator to go to the jury either upon the theory that the defendant had failed in its duty of care to the deceased after it took him as a passenger in his then evident condition or under the doctrine of the last clear chance. As to the former, the administrator made out a *prima facie* case when he established that the defendant took a helpless drunken individual upon its train for hire and caused him to be dropped from one of its elevated cars at a point beyond a station used by passengers for entering and alighting from trains and thereby caused its passenger's death. The explanation for that conduct was for the defendant but the complaint was dismissed at the close of plaintiff's case. What the administrator was able to prove came from an examination before trial of the conductor and from the testimony of the motorman who was called by the administrator. The conductor, Dingle, was not put upon the witness stand by the defendant to make explanation.

The administrator was also entitled to go to the jury on the facts related above under the doctrine of the last clear chance and the jury could have found that Dingle did not exer-

cise due care when he failed to pull the emergency brake cord while the train moved fifty-three feet during which the deceased was *immediately before him* in a position of peril. In his examination before trial Dingle testified that after the deceased left the train the latter walked eighteen feet or more into the station waiting room and then retraced his steps more rapidly to the platform of the train on which Dingle stood, all in the twenty-five to forty seconds that the motorman said the train remained at the station, and then seized the uprights after the train had moved about one foot. If the jury believed the testimony of the toxicologist as to the condition of the deceased on autopsy, the jury might well have found that that testimony of Dingle was incredible. The jury might rather have found that the deceased had mistaken his station, had gone one station too far, discovered his error when he stepped off the train, attempted to re-board it, thereby putting himself in the position of peril, and that Dingle instead of immediately pulling the emergency cord, endeavored to loosen the hold of the deceased on the uprights, or did nothing, and only pulled the emergency cord when it was too late. At any rate, what occurred after Dingle saw the deceased in peril and whether or not there was then negligence on the part of the defendant were questions for the jury.

The doctrine of " the last clear chance " is predicated upon the fact that knowledge of the *peril* as an actual fact has been brought home to the person charged with the subsequent negligence. As was stated in *Woloszynowski* v. *N. Y. C. R. R. Co.* (CARDOZO, J., 254 N. Y. 206, 208): " The doctrine of the last clear chance, however, is never wakened into action unless and until there is brought home to the defendant to be charged with liability a knowledge that another is in a state of present peril, in which event there must be reasonable effort to counteract the peril and avert its consequences. (*Wright* v. *Union Ry. Co.*, 224 App. Div. 55, 250 N. Y. 526.) Knowledge may be established by circumstantial evidence, in the face even of professions of ignorance (cf. *Bragg* v. *Central N. E. Ry. Co.*, 228 N. Y. 54), but knowledge there must be, or negligence so reckless as to betoken indifference to knowledge." Thus in the instant case the administrator was obligated to show

that the conductor Dingle knew that the decedent had placed himself in a position of danger (that he established beyond all question by Dingle's own testimony on his examination before trial). In addition the administrator was required to show that, with knowledge of the perilous situation of the deceased, Dingle failed to use reasonable care to avoid the accident (*prima facie* proof of that was made by showing that the train moved for fifty-three feet after Dingle knew that the deceased was in peril *before* he pulled the emergency brake to stop the train). Finally it had to be established that the failure on the part of Dingle to use reasonable care was the proximate cause of the accident. Those matters were all questions of fact for a jury. (*Grand Trunk Railway Co.* v. *Ives,* 144 U. S. 408; *Lewis* v. *Long Island Railroad Co.,* 162 N. Y. 52, 62; *Bragg* v. *Central N. E. Ry Co.,* 228 N. Y. 54, 57 [where a sectionman on the defendant's railroad went to sleep while seated on a railroad tie and was run over by an engine]; *Harris* v. *N. Y. City Interborough Ry. Co.,* 260 N. Y. 620; *Panarese* v. *Union Railway Co.,* 261 N. Y. 233, 236.)

In the *Bragg* case the engineer testified that as soon as he saw Bragg he whistled and applied the brakes. In view of other testimony we said (p. 58) that " the jury may have disbelieved the statement of the engineer as to the brakes. They may have thought he contented himself with blowing the whistle and made no further observations as to its effect until the deceased was struck." In *Storr* v. *New York Central R. R. Co.* (POUND, J., 261 N. Y. 348, 351), we said: " If one by a negligent act places himself or his property in a position of danger his negligence does not contribute to defeat his recovery if the situation was known to the defendant in time to avert the consequence of plaintiff's own negligence. In such a case the defendant's negligence is the sole cause of the injury. It must not run on ' inert and callous ' and cause an accident which proper care might have avoided."

The judgments should be reversed and a new trial granted, with costs to the appellant to abide the event.

RIPPEY, LEWIS and DESMOND, JJ., concur; LEHMAN, Ch. J., and LOUGHRAN, J., dissent; THACHER, J., taking no part.

Judgments reversed, etc.